The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez! Oyez! Oyez! All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to draw nigh and give their attention where the Court is not sitting. God save the United States and this Honorable Court. Thank you, Chief Judge Gregory, and may it please the Court. Will Haverman on behalf of Kalshie, I'd like to reserve six minutes for rebuttal. As the Third Circuit recently held, Congress's decision to vest the CFTC with exclusive jurisdiction over trading on federal derivatives exchanges preempts state efforts to ban Kalshie's event contracts. The CFTC itself has emphatically defended its exclusive jurisdiction, noting that state efforts to regulate in this area are, quote, Now, the District Court's contrary conclusion cannot be reconciled with the text and would create a circuit split with the Third Circuit if affirmed. The Court agreed that the CEA preempts the field, but carved out an exception for state gambling laws without explaining how that could comport with the textual grant of exclusive jurisdiction to the CFTC over derivatives traded on designated contract markets. And to begin with the plain statutory text, the Commodity Exchange Act grants the CFTC, quote, exclusive jurisdiction if two conditions are satisfied. If there is exclusive jurisdiction over this, it seems to me that there might be an argument that there's exclusive jurisdiction over all gambling, including, like, state lotteries. And, I mean, there will be nothing for the states to regulate in terms of gambling. This just seems like gambling. Not at all, Judge Thacker. And this was an argument that was made in the Third Circuit case. And the Third Circuit said no as to those sort of far-fetched hypotheticals. And here's why. Why is it far-fetched? For a couple of reasons. First is the text of the Commodity Exchange Act itself. The savings clause that the district court itself relied on to conclude that maybe the field isn't as broad as the text suggests, that savings clause provides that except as provided for the CFTC's exclusive jurisdiction over on-exchange transactions, nothing contained in this section shall supersede or limit the jurisdiction of regulatory authorities under the laws of any state or restrict state authorities from carrying out their duties and responsibilities in accordance with such laws. So that would allow states that have, you know, a comprehensive regime for regulating sports betting to allow that. That's the first point. The second point, Your Honor, is just the text of the CEA itself refers to instruments that can be traded or executed on a designated contract market. And that language is important, traded or executed. I guess, I mean, I know the district court just skipped over, just assumed it was a swap. But assume, I don't want to just assume it's a swap. Why is it a swap? Sure. So it's a swap because it falls within the statutory definition of a swap. And I can sort of take you back through the statutory provisions. That sounds easy, but this is, to me, very complicated. Sure. How does it fall within the statutory definition of a swap? A swap is defined in a six-part provision of the Commodity Exchange Act that was added to the Commodity Exchange Act in Dodd-Frank. There are two provisions of that definition that are especially relevant for present purposes. The first is a swap means an agreement, contract, or transaction that provides for any purchase, sale, payment, or delivery dependent on the occurrence, non-occurrence, or extent of an occurrence of an event or contingency associated with potential financial, economic, or commercial consequences. So it refers to events associated with potential financial consequences. And the difficulty of the defendant's position in this case, and the difficulty with, I think, some of the district court's analysis, although, Judge Thacker, you're right that the district court didn't squarely address the swaps issue, but the difficulty is that they have to persuade the court that, as a categorical matter, sports events lack even potential financial, commercial, or economic consequences. And what the CFTC has now told the Ninth Circuit and has told five different district courts where it has brought affirmative lawsuits to ensure that it is protecting its exclusive jurisdiction is that that is just not correct. Here is what the CFTC itself told the Ninth Circuit with respect to this precise issue. Sporting events are economic enterprises that generate billions of dollars in economic activity, materially affect both regional and national markets. Stadiums function as regional economic anchors that function around a network of businesses, including hotels, restaurants, transportation providers, retailers, and event management firms. So the suggestion that, as a categorical matter, it's possible to carve out sports events from the type of events that have economic consequences is just not a tenable interpretation of the statute. And so that's why these transactions are swaps. That's the first definition that's relevant. The second definition that's relevant is it's a forward-looking definition. Congress did not want the idea of what constitutes a swap to be frozen in time, and instead it said anything that in the future. So I'm still going back to my beginning thought. So only sports gambling falls within the exclusive jurisdiction, not all the other kinds of gambling? No, Your Honor, and to be totally clear, our position is not that sports gambling falls within the CFTC's exclusive jurisdiction. The CFTC has exclusive jurisdiction over trading on designated contract markets. That includes the trading of event contracts, and it does not matter what the underlier. So it's just this particular method of sports gambling? It is the method of derivatives trading, we would say, where the underlier is an event, and Congress made quite clear that it intended for derivatives trading to be permitted on designated contract markets where the underlier is an event, and there's nothing in the text to suggest that the underlying event cannot be a sport contract. So that's the first answer to your question, but to get to Your Honor's confusion, we are not saying, and it is not a correct interpretation of the CEA, to say that that means all sports betting then has to happen in the DCA. I know. You keep saying that, but then your explanation to me of why you're not saying that sounds like, yeah, that's what we're saying. No, no. So it's a distinction between on exchange and off exchange. That's the savings clause that I referred to. And so other sports betting regulated by the state, that's off exchange. The CEA doesn't think it gets to regulate that. We don't think it gets to regulate that. We think that that's clear from the text. Does it matter that you advertise as sports betting? No, it doesn't. You agree that you all do advertise as sports betting, but you're saying it's still a contract regardless of us advertising as sports betting. Yes. I don't dispute that a year ago we did advertise as sports betting. We don't do it anymore, but you're right, we did. But I would say even . . . Why not? I think because it has caused the very confusion that I think is raised and braves against us. But in addition to us advertising as betting with respect to sports, I would just note that the same advertisements that the defendants point to refer to betting with respect to elections, refer to betting with respect to underlying contracts that have nothing to do with sports. And that really does get to, I think, a limiting principle problem with the defendants. So I understand your argument to be that swaps are broadly defined, because they are broadly defined. I'm just trying to figure out what kind of contract would not count as a swap. Sure. So the statutory hook is it has to have potential financial, commercial, or economic consequences. And there are contracts that sports books offer that CALSHI does not, because there are people in CALSHI that take a look at it and say, we don't think we can justify this as having potential financial, commercial, or economic consequences. And we certify these to the CFTC. The CFTC has the opportunity to tell us, don't offer that contract. We don't think that that has sufficient economic consequences. That's not hypothetical. The CFTC now is in the process of a rulemaking where it is asking exactly these questions. It is asking exactly the question, what sort of financial consequences count? What sort of events can be the underlier? How do we think about gaming and the like? So if the CFTC is still grappling with this and courts are sort of a little all over the board and there's some confusion, the Sixth Circuit recently denied the injunction because all of this equipose must necessarily mean you can't meet the first prong of likelihood of success on the merits. That's not quite right, Your Honor. We sought an injunction pending appeal from the Sixth Circuit, and that was denied, although the Sixth Circuit there noted that the question was extremely close and its analysis was predicated on we're not going to give this relief pending appeal, but it expedited the case for precisely the reason that it found the questions close. And just on the merits of the Sixth Circuit's decision, the Sixth Circuit concluded that there was ambiguity about whether an exclusive jurisdiction provision preempted state law. And I do want to get back to the district court's opinion in this case because I think the district court's opinion in this case just can't be reconciled with the text. Exclusive jurisdiction means not shared with others. So Judge Thacker, to get back to your earlier question, the fact that the CFTC is engaged in a rulemaking process, the fact that it's bringing lawsuits in federal court saying we have jurisdiction over these instruments, these instruments are no different than other event contracts. They're no different structurally than other derivatives that have been trading on our markets for decades. Yeah, but they may be. They may be different. I mean, it started off, you know, in Chicago, you know, the commodities and sour bellies and cotton and corn and tobacco and all of those things are all traded. And probably the most important people were meteorologists to figure out whether or not it was going to be a rainy season or a dry season in terms of how you wage it. But now it's gotten to the point where you said it's so broad that it includes anything that's an occurrence. And some of them are quite surprising what people are having contracts on, as you're saying now, under the derivatives, if you will, of future events. And so isn't it on the side of saying, wait a minute, well, Maryland has been involved in this for a long time. You know, I'm a Virginian, so I know about Maryland's history because if you grew up in 1995, I was too young to do anything, but it was slot machines and things like that. They were all regulated. But they were in that business for a long time to protect Marylanders. And now the government is sort of like all this is fine. Like you said, I noticed your answers to my dear friend and colleague just back, and you said, oh, yeah, and hotels are involved and all this and all economics. But, you know, if it quacks, you know, it's a duck, right? It's gambling, isn't it? It's basically gambling. That's what Maryland is saying. You are gambling. People, you know, derivatives and all that, but it's gambling at a point that is incredible in terms of sports and controversies that occur around the country about people in terms of games and things like that and what it turns on and who's doing what. It's an issue. And the states say that's part of their job to police powers, isn't it? Sure. Aren't you so broad that you just sort of use that preemption, but that's a federalism issue too, isn't it? Go ahead. Sure. So I agree that that's the defendant's argument, right? They say this quacks like a duck, it looks like gambling, and I think that was driving a lot of what the district court was doing too. But the problem, Your Honor, as Your Honor noted, right, commodities started out as trading in grain futures or corn futures. And do you know what states did in the late 19th century? They said that's gambling. It's obvious. You're speculating on the future price of a commodity. The commodity itself never changes hands. That is gambling plain and simple. And many state gambling laws were adopted specifically to prohibit futures trading itself on the ground that they thought it quacks like a duck, Judge Gregory, as Your Honor noted. And this is there are statute after statute after statute in the late 19th and early 20th century that make exactly the point that the state is making now, right, that this looks like gambling, it involves speculation and the like. And the decision that Congress made in 1974 and then reaffirmed in 2010 is, with respect to transactions on designated contract markets, regardless of whether a state thinks it looks like gambling, that is the CFTC's purview. They have a whole number of tools in their tool belt to deal with questions about, you know, is this appropriate on a DCM? But it is hands off for states. And with respect to the gambling point in particular. Well, let me ask you this. So what happens if, and I know that they have these rulemaking questions out there now, what happens if the CFTC says that it's not appropriate on the DCM? So then would the states be able to regulate at that point? So if the CFTC says it's not appropriate on a DCM, this is what happened two years ago with Calshi's election contracts. And if the CFTC makes that determination, then a regulated entity can bring suit under the Administrative Procedure Act and get judicial review of that. And that's what Calshi did with respect to its election contracts and in a great opinion by Judge Cobb in D.C. Judge Cobb agreed with us. So that's how it's supposed to work. You have one federal regulator who makes a call as to these instruments on a nationwide basis, subject to judicial review. But I think Judge Benjamin was asking, then would the state get to regulate it in that instance? And it sounds like no, it's still over there. If the CFTC prohibits us from offering the contracts, then we can't offer the contracts. Nobody would regulate. So no one, they wouldn't exist, right? I think because the contracts, and this gets to an important, I think, distinction between what the states regulate and what these instruments are. These instruments are nationwide. They're contracts between different customers on a nationwide basis. So to get to conflict preemption, I mean we've been talking about sort of express and field preemption. To get to conflict preemption, Maryland has a law that says that all, if it's a wager, all wagers have to be from people who are physically present in the state of Maryland, right? So, of course, state-regulated sportsbooks can comply with that law because a sportsbook is the counterparty to a bet. It sets the line. These are customer-to-company transactions. But on a DCM, just like with respect to all other derivatives contracts, these are nationwide contracts where someone in Maryland is contracting with someone in New Jersey, where we have a preliminary injunction, or Arizona, where we have a preliminary injunction. The state has never articulated how it could be possible in this structure that Congress created under the CEA to comply with these state laws. So in direct answer to Your Honor's question, I think, I mean, you know, we would see what the option was after any adverse ruling, but if the CFTC said that these cannot function on a DCM, that is what these instruments are, and so they just wouldn't exist outside of that. So I think that's the likeliest outcome, at least. And is it of any consequence that, at this point, that the CFTC is not regulating? I mean, does that give the states the ability to come in and regulate? No, I really want to push back on the premise of that question. They are. They are regulating us. They are actively regulating us. And the fact that they don't have a rule yet, I mean, there is an advance notice of proposed rulemaking. We have to self-certify. We have to go through the process that every designated contract market... Yeah, but I thought that you all basically self-certified, and the CFTC hasn't said anything regarding this. There's been no response, I guess, as to your self-certification. It is a passive approval process, so that's true. That's the system that Congress created. But that's true with respect to the Chicago Mercantile Exchange. It's true with respect to the Intercontinental Exchange. So no one would suggest that because the Chicago Mercantile Exchange self-certifies its contracts, then with a bunch of back-end opportunities for the CFTC to exercise review, that that means that the Chicago Mercantile Exchange isn't subject to CFTC regulation. And the same point is true for us. It is a passive process, but the CFTC absolutely has the authority to prohibit us from offering these contracts. It can do a public interest review, like it did with respect to our elections contracts. It can do a rulemaking, which it is now in the process of doing it. So we are absolutely regulated by the CFTC, and the fundamental problem for the states is that their problem is that they don't like the way that our exclusive federal regulator is regulating us. That's the fundamental issue here. They do not like the fact that our... Well, they, of course, claim that you aren't being regulated. They do, but that is not borne out by the facts, and it's especially not borne out by the fact now that the CFTC... But that's the same thing could be said of the Chicago Mercantile Exchange. What does passive regulation mean? It's a passive approval process. It's not passive regulation. So until the year 2000, the Commodity Exchange Act required an active approval process by the CFTC. Congress, in 2000, made the decision to end that process because it was inefficient and because it hampered innovation. So instead what it said was you can self-certify to the CFTC, then the CFTC has the option to say, no, we don't think that contract is appropriate, or under a Dodd-Frank to subject a particular contract to public interest review. And again, the problem is that that is how the CFTC is regulating us. They have now gone to court after court after court to say, yes, these products belong on our exchanges. Yes, we are regulating these products. That means it is hands-off for states, and that is the import of the exclusive jurisdiction of the CFTC that has been in the statute since 1974. Do you have any idea why there are no rules at this point, really? I think there was a proposed rule two years ago that was the logic of the rule was invalidated by Judge Cobb's opinion in D.C. So they went back to the drawing board. There was a long process for confirming a CFTC chairperson. As soon as the CFTC chairperson was confirmed, they initiated this process. So right now it's passive because it's based on your interpretation of what the statute means, and then you certify that you're doing what you believe it means that you have to do, right? That's basically why it's passive. We certify that it complies with the CEA. As you interpret it, because you've given the answers, and it's very good, but as broad as it could be in terms of what you think is regulated by the federal statute, which is everything that involves some derivative aspect of it, right? It's instruments traded on a designated contract market, so it's not off-exchange instruments, which is, I think... I know that. But with respect to on-exchange instruments, yes. But the fact that there is no rule in place, Judge Gregory, doesn't mean that the CFTC doesn't have all the tools in its tool belt to say a contract is no good, to subject a contract to public interest review. And I do think this is important, because to get back to Your Honor's earlier question about, well, this sort of looks like gaming or gambling, there is a provision of Dodd-Frank called the Special Rule that specifically addresses contracts involving gaming. And it says not that derivatives instruments or swaps involving gaming aren't swaps. It doesn't say that. It doesn't say that 50 different states get to regulate these. Instead, it says that the CFTC has the authority to make a public interest determination on a nationwide basis with respect to these instruments. So even if you sort of accept the district court's analysis, which is to say, you know, we apply a presumption, and, you know, you look to specific evidence that Congress intended to regulate these products, that is right there in the Special Rule. There is an irrefutable textual reference to contracts involving gaming. And these are contracts that Congress understood to be swaps. They're contracts that Congress understood could be properly on a designated contract market, subject to the CFTC's ability to regulate them. And that's our point. The CFTC has the ability to regulate these contracts, but 50 different states don't. And that was an intentional choice that Congress made, because it recognized that subjecting derivatives markets that are inherently nationwide to 50 different sets of regulators, it's not just Maryland. It's Maryland and 49 other states that could look at these contracts and say, I think this looks like gambling, or I think this, you know, violates our police powers. And Congress recognized that that just could not work with respect to nationwide derivatives exchanges. That's why it gave this authority to the CFTC, and the CFTC is regulating us. So just... So it's your position that you self-certify, right? And that you're in compliance with 4011. But which... I guess what I'm confused is, because 4011 prohibits gaming contracts. So how is it that you say that you are self-certified and that you are complying when it prohibits gaming contracts? Sure, there's two elements to the question, and I want to make sure I address them both. The first is, what does 40.11 prohibit or not prohibit? And I am happy to get into that. I do want to make clear that even if the defendants are right about what 40.11 prohibits, that doesn't give rise to springing state jurisdiction, right? Even if they're right... Well, because it says, especially in its special rule, they came back and said gaming. Right, gaming. So the question is, there's two questions. There's the question whether 40.11 is a categorical prohibition, and it's a very difficult regulation to understand. We don't read it as a categorical prohibition because 40.11c refers to approval or disapproval of a contract involving the enumerated categories. So we don't read it as a categorical prohibition. There's also a question of whether or not these contracts involve gaming, and at the Ninth Circuit argument just a few weeks ago, the CFTC informed the Ninth Circuit of its view that these contracts don't involve gaming, so that would be another reason why we are in compliance with 40.11. Yeah, but, I mean, with local right, I'm not sure. I mean, it's just their view. Sure, sure. That's all true. But we don't, you know, we have to follow our federal regulators' view about what counts subject to all the appropriate judicial review, but there is at least a real question as to whether 40.11 operates as a categorical bar at all, and there is a real question about whether these contracts involve gaming or not. But all of that aside, the most fundamental point that I want to impress on the Court is that whatever the regulation says, it doesn't mean that states get to regulate us. It may mean we have a problem with our federal regulator if we're in violation of a federal reg, but it doesn't mean that these contracts aren't swaps. It doesn't mean that there is sort of springing 50 different state jurisdictions over these contracts. They're contracts on a designated contract market. If we're in violation of a federal regulation, then the CFTC can take appropriate action. Which kind of takes you back to, like, my earlier question, right? If they decided it's not appropriately... Yeah, and then we would take, you know, we would challenge it if we thought there was a basis to challenge it subject to judicial review, which is what we did in D.C., and we prevailed. But what we can't do... I mean, what the real difficulty here is is we can't respond to 50 different state gambling regulators saying to us, we think you have to comply with this law in Maryland, we think you have to comply with this law in New Jersey, we think you have to comply with this law in Nevada, we think you have to comply with this law in Arizona, many of which conflict with each other and which destroys the uniformity that Congress... The whole point of giving exclusive jurisdiction to the CFTC over these instruments, and that's key. The uniformity feature of this scheme is key, and that is why the Seventh Circuit, in a case that long predated these contracts, said, look, if the upshot of a state regulatory effort is to directly affect trading on a designated contract market, it's preempted because that conflicts with the uniform system of regulation that Congress intended to enact in 1974. That's all we're saying here. State regulation is preempted. We can deal with our federal regulator. When there's a rule, we will have clear rules of the road. If it goes against us, we can challenge it, but we can't be regulated by 50 different states. That would be anathema to the CEA, and it would be unprecedented with respect to contracts over which the CFTC has stated that it has jurisdiction to nevertheless let 50 different states come in and second-guess that determination on the basis that they think it looks an awful lot like gambling, because states have been saying that for 150 years, and Congress nonetheless made the choice to give these contracts to the CFTC. Okay. Mr. Haberman, these cases probably very likely will end up with the Supreme Court deciding, I guess, perhaps what they'll do, but I'll ask this question to you. To the extent... Is your position that what you now say is passive, and I think as you define it, it is very passive in terms of regulation, no rules. If it gets to the point where this is... The state makes a case that this is harming... Notwithstanding you don't want to have, not understanding 50 different regulations that comply, but if that gets to the point where the passive, as you say, situation here with these DCMs such that it's harming the state and their position, your position that states have no recourse in courts to come and say this is now... You know, the tail is wagging the dog or whatever, in the sense it may have started with commodities, but now the part that looks like gaming that you say is a swap, because it's broad language, I understand your point, but if that's... Are you saying that there's no recourse for states at all? That this just runs them up? I don't mean that it is, but I'm saying is that your position that as long as you are okay with the federal government in the way that they are non-regulation or passive or however you want to call it, the states will have to say nothing we can do? Is that your position? I just want to know, is that... No, it's not our position, but what they can't do is sue DCMs for offering contracts that our federal regulator has permitted, but they can do what Cal-SHE did after we got a bad decision from the CFTC two years ago, which is bring an APA suit against the CFTC, and they can say if they don't like the regulation that the CFTC adopts and they participate in the rulemaking process, they can challenge it if it aggrieves them, or there is precedent from the DC Circuit that says with respect to a scheme exactly like this one, and I think that there is some sense that passive regulation is pejorative. I want to make clear it's not. It's the scheme that Congress intended. It's the scheme that Congress created because it didn't want to hamper innovation in these markets, but there is precedent from the DC Circuit that says in exactly a scheme like this one where approval is passive unless the agency comes in and prohibits it, that's final agency action subject to judicial review under the APA. So a state can come after the CFTC, but the benefit of a state coming after the CFTC is that that would then be a decision that binds the CFTC in their regulation of DCMs nationwide. So we have one set of rules that we have to follow governed by whatever the outcome of litigation is with respect to the CFTC. The problem with the scheme that sort of has arisen in the past year is that we now have 50 different state regulators claiming that we have to comply with 50 different sets of state laws, and that is clearly not what Congress intended in the Commodity Exchange Act. Thank you, Mr. Abbott. Thank you. Mr. Brouwer. May it please the Court. Max Brouwer on behalf of Maryland. Sports wagering is an area of core historic state police powers, and it requires clear and manifest congressional intent to preempt. But Congress had no intent to preempt state sports wagering laws when it passed Dodd-Frank to address the 2008 financial crisis in part by adding swaps to the Commodity Exchange Act. Therefore, the Commodity Exchange Act does not preempt Maryland's sports wagering act. It's important to begin our preemption inquiry. Unless we conclude that these are swaps, right? Do you concede that if these are swaps that there's exclusive federal jurisdiction? No. The exclusive jurisdiction in Section 2 does not preempt. There is no clear and manifest intent for that to preempt state sports wagering law, and we also argue that these sports wagers are not swaps to begin with. That's where I need to start. I'm trying to understand, is it a swap? Is it not a swap? So why is it not? It's not a swap. It's not a swap, first, because the text provides limiting principles that say it's not a swap. Second, it's not a swap because Congress's intent was it not to be a swap. The Feinstein and Lincoln colloquy explicitly stated that sports wagers would not have any financial consequences. Financial consequences, of course, is one of the limiting principles in the text. Third, the CFTC and SEC have further defined swap via notice and comment rulemaking, August 13, 2012, and that rulemaking says that consumer and commercial transactions, not historically known as swaps, are not going to be considered swaps. This was just after Dodd-Frank. And sports wagers have never historically been understood to be swaps, not in 1974, not in 2008. Well, how does that work with the special rule where they add gaming? Sure. I mean, it says, the plain language of it says gaming. Sure, and the special rule allows the CFTC to police its own turf. It does not allow the CFTC to preempt other turf. The special rule gives the CFTC, because it's a self-certification authority, the authority to prohibit contracts that involve assassination, war, gaming, anything unlawful under state law. So it can't be said that that is giving the CFTC the authority to preempt gaming law any more than it's giving the CFTC the authority to prohibit assassination law, war, or even more broadly, anything unlawful under state law. The CFTC, simply by listing an unlawful contract on a DCM that preempts whatever state law is there that would allow essentially any illegal contract to be laundered through a DCM. Rather, what the special rule is doing is just giving the CFTC the ability to police and remove contracts from its own markets pursuant to the authority that Congress has delegated to it. Or, as Senator Lincoln said, it strengthens the government's ability to protect the public interest from gaming contracts and other event contracts. Strengthening the public interest does not mean preempting other laws. But I do want to come back to Judge... Yeah, when... I wanted to come back to it as well. When you first... In your first response to why this is not a swap, you indicated first because of the limiting principles. What are all those? Sure, so let's look at the text in Romanette 2 where event contracts are defined. There's two limiting principles. First, a swap has to be based on the occurrence of an event, not an outcome. Sports wagers like winning the Super Bowl, that's an outcome. All right? It's not an occurrence. So you don't think the Super Bowl is an event? The Super Bowl occurring is an event. Winning the Super Bowl is an outcome. And I'd refer the court to the Crypto.com matter out of the District of Nevada, pages 7 and 8. The court goes through a long list of dictionary definitions establishing that the plain meaning of occurrence is different than the plain meaning of outcome. That's just limiting principle number one in the text. Limiting principle number two is that the swaps must be associated with a potential financial, economic or commercial consequence. And Cauchy's interpretation would write associated with and consequence out of the statute. We have to give those words their ordinary natural meaning. Associated means joined or connected together. A consequence, something produced by a cause, necessarily following from a set of conditions. We don't, as the District of Nevada said in the Hendrick decision at 6, look at downstream externalities. Otherwise we would have no limiting principle. Anything could be a consequence. But here there are no consequences, no financial consequences to sporting events. I don't understand how you say there's no financial consequences to sporting events. And it says associated with. I mean, I'm assuming the Super Bowl, I don't know where was the Super Bowl, in Los Angeles, I think, this year. I would think that the city of Los Angeles would say that there are lots of financial outcomes from the Super Bowl event or occurrence. I mean, how do you say it's not any financial... I'm just confused. I did speak a little broadly, Your Honor. I said the Super Bowl doesn't have financial consequences. Of course it does. The winner of the Super Bowl, though, doesn't matter. The TV networks, the commercials are paid for ahead of time. It doesn't matter who wins or how well any player performs. The hotels, the media, the advertisers, the sponsors, they're all going to make money regardless of the result. The value of the franchises aren't going to change. The Dallas Cowboys haven't won anything in a really long time, and they're the most valued franchise in professional sports right now. So the word consequence, though, to necessarily follow from a set of conditions, simply winning the game or how many rebounds LeBron James is going to get in the playoffs, that is not going to produce any type of requisite financial consequence, particularly not when we look at the definition of event contract in Romanet 2 in its context. Romanet 3 lists a whole host of other swaps that do have that tight financial connection to rates, indices, and legitimate hedging interests. That's also Romanet 1 as well, to include an event to be so broad that it includes all financial consequences would swallow these whole. But I think most importantly, perhaps, why a swap is not a sports wager isn't 2E. Because 2E of the Commodity Exchange Act requires that it shall be unlawful for any person, other than an eligible contract participant, which are certain specific financial institutions like banks, to enter into a swap, unless the swap is entered into on a regulated contract market. Under 2E, Congress made it clear that all swaps must be traded on contract markets. So if a sports wager is a swap, all sports wages, whether they're offered by Calshi, FanDuel, DraftKings, or any other sports wagering outfit, must be regulated by the CFTC, and this would make the CFTC the nation's sole gaming regulator. Congress was very clear about that, and that's entirely consistent with the purposes of Dodd-Frank, which were to make these opaque swaps that resulted in the financial crisis transparent on transparent markets. But sports wagers have nothing to do with those other swaps, as defined by statute. In fact, if all sports wages are swaps and all swaps must be traded on designated contract markets, and Section 2 gives the CFTC exclusive jurisdiction with no room for state law at all, that would make the CFTC the nation's sole gaming regulator, and Congress does not silently or so cavalierly decide to preempt state law or enact such a sea change. It would violate a whole host of canons. No elephants in mouse holes, implied repeal of other state and federal gambling laws, absurdity, no limiting principle. That can't possibly be, under our ordinary canons of statutory interpretation, the correct result. So I would like to get back into what the exclusive jurisdiction of the CFTC means, and I think it's important when we're looking at whether it has preemptive effect or not, or the extent of that preemptive effect, to make sure we ground the inquiry in our basic preemption principles. Preemption's not a freewheeling inquiry about whether a state statute is in tension with some brooding federal interest. You need clear and manifest congressional intent to preempt state law. The presumption against preemption applies in all cases, and it's the first place we start, and it applies... Let me ask you this real quick. Yes. So if we were to say that it's not... as you would have us say, that it's not a swap, then we wouldn't need to do the preemption analysis, right? No, if sports wagers are not a swap, we don't even need to be talking about the Commodity Exchange Act, because the exclusive jurisdiction of the Commodity Exchange Act is only over, one, commodity futures, and two, swaps traded on designated contract markets. So if it's not a swap, Section 2 of the Commodity Exchange Act doesn't even come into play here. But we still have the special rule in, I guess, 2010, where they add the word gaming. Sure, but, uh... assassinations, anything... When you look at the other words in the special rule, is anything unlawful under state or federal law a swap? That's a really, really broad category. Um, so... Let me ask you... Clearly, those are not swaps that the special rule allows the CFTC to wholly swallow other federal and state authorities' jurisdiction over those areas. And counsel, on the other side, obviously is saying that it's written, it is broad, and it includes all of these, you know, includes these contracts. Broad, but not quite that broad, for the reasons we've already stated, that it's outside the limiting principle, it doesn't have a financial consequence. The CFTC-SEC rule already said that instruments historically not considered swaps are not swaps. And then, when we look at the legislative history, Congress even said that we want to keep sports wagers off of these contract markets because they don't have the requisite financial consequence. So, and I'm... Before you get into your preemptions, the... In the Ninth Circuit, they took the position that these aren't gaming contracts. Recently. The CFTC's recent position? Yes. That is... That cuts against the CFTC's own binding regulations. It's a policy statement, and it wouldn't have even been entitled to deference before Loeb, right? It certainly isn't right now. Rule 4011A, as Your Honor indicated before, does say, shall not list. The CFTC promulgated that rule through notice-and-comment rulemaking. It blanket bans gaming contracts on CFTC-regulated exchanges. That's what District of Nevada held in Hendrick, and they have a good analysis of that point. It says, shall not list. The text there is clear. So the CFTC's position is in opposition to its own regulations right now. And, again, the further definition of swap that says that instruments that are not historically considered swaps are not swaps, the CFTC's current position cuts against that regulation right now as well. So the CFTC's position isn't even consistent with its own regs and isn't entitled to any deference anyway. Now, I think it is important, though, to return to the preemption analysis if the court were to find, or if the court were just to simply assume, as a district court did, that sports wagers were swaps, we still have to go through the preemption analysis here. And since sports wagers, as the Supreme Court recognized in Murphy, are part of the core historic police powers of the state, we have a strong presumption against preemption, and we need to first start our preemption analysis not by looking at whether the federal law addresses the federal interest, like Calshi does, but our precedents say we need to look at the text of the state law and whether it targets an area historically subject to state regulation. Maryland's sports wagering statute quite clearly regulates sports wagering. The Commodity Exchange Act does not. These are different domains. The Commodity Exchange Act provides a legal framework for transparent commodity future and swap markets. The purpose of the Commodity Exchange Act, the actual legislatively enacted purpose in Section 5, addresses marketplace regulations like preventing disruptions to market integrity and avoiding systemic risk. That's completely different than what the Maryland sports wagering rule does to help prevent gambling addictions and promote the health and safety of Maryland's citizens. It's important to note, too, under these contexts, that Calshi's sports wagers are not materially different from any other sports wager. Calshi has its own proprietary market makers that function as a house. Calshi sets the odds. Calshi markets these as sports wagers. And... But you would agree that it's different than normal sports betting. In some ways, I mean, you can't... You're not betting against a house, right? No, Calshi does have proprietary market makers that function like a house. But in addition, there's no distinction either under the Commodity Exchange Act or under sports wagering law, federal or state, between house or not a house. So the Commodity Exchange Act doesn't... It doesn't matter under the CEA, under a swap, whether you're trading against a house or, you know, purchasing a swap from, you know, a bank under its own proprietary name or whether you're trading swap between two independent parties. Maryland's... Well, that cuts against you, doesn't it? The whole point, it seemed like, they wanted it to be a field preemption. I mean, since these things that you say is broad, they're meant to be broad, isn't it? That's what they want to do. They want to cover the field. That's why you use broad language. As a matter of fact, that's why I suppose they would say it's been a while to get the rules because they want to see how they're going to regulate it, and they'll fine-tune it. And I guess they'll say the states will be witnesses and bring their things to the table and say why you need to do this. But right now, it looks like it's broad. That's why they put gaming in there. And you don't think it should be a swap, but apparently someone did when they drafted it. Gaming was being involved, right? No, field preemption only applies in rare cases where Congress legislates so comprehensively as to leave no room for state law, but the text... This sounds like one. Well, the text leaves room, and it leaves room in a few areas, and here they are. Your Honor mentioned gaming. The CEA, outside of Section 2, has an express preemption provision in 16E2 where Congress considered what preempts state gaming law, and the only thing Congress came up with were certain categories of commodity features, not swaps. Congress also decided in Section 16A what laws are swaps going to preempt, and the only thing they came up with in 16H was state insurance laws. So Congress had the opportunity and expressly considered what categories are going to be preempted by gaming, what categories are going to be preempted by swaps, but Congress never said that gaming law over swaps are preempted. That in and of itself is dispositive. But the text also makes room for state law elsewhere. Section 2 itself has savings clauses. Savings clauses, by definition, mean that there is room left for state law. You cannot have Swiss cheese field preemption where there is some state law retained, so a field preemption inquiry is totally inappropriate in the face of savings clauses. And in addition, as I've noted before, the special rule really incorporates state law and allows state law and the CEA to complement each other. By putting gaming into the special rule, it just allows the CEA to have some mechanism to remove these contracts from its own turf and not have to wait for some other regulator to come around and do the policing for it. When it comes to preemption, the correct analysis here is conflict preemption. That's what precedent has stated. So let me, yeah, I want to ask, so how is this, if we were to agree with you, how is this not conflict preemption? Because you'll have the federal regulation, the federal regulation, right, and the CFTC regulating these events before them, right? And then you'll have states doing different, how does that not, I mean, how is that not conflict preemption if you have one state doing this, another state doing that, the CFTC regulating, how is that not conflict preemption? Sure, I'll take each of your points in your question in turn here. First, conflict preemption is a correct inquiry, as the Seventh Circuit has noted, in American agriculture. What Section 2 is, the preemptive scope of Section 2, is the actual operation of commodity futures markets. So then under conflict we have to ask, is it impossible to comply with both the state law and the federal law? And here all Calshey needs to do is get a license in Maryland. It can comply with both. It can get a license and offer sports wagering and still comply with the federal law. It's not impossible to follow both regulations. Calshey mentions an impartial access requirement. That's just meant to prevent discrimination. It's not meant to prevent any state from providing any other law there. And then when we look at obstacle preemption, that's a very high standard, and it looks to the purpose of the statute. And the purposes of the CEA, again, deal with the actual operation of the commodity futures market. Maryland's not regulating that. It's a health and safety regulation over sports wagering to require licensing and to make sure that companies offering sports wagering are not preying on gaming addicts. Those two are completely different. And if there is some tension between the two, we, as this court has said before, and as the Supreme Court has said in Wyeth and in Benito Boats, we accept the tension that exists between the two. Now whether states' laws may be in tension with each other, this whole, you know, 50 different states, that's a basic tenet of federalism. We have independent sovereigns in our federal system, and Maryland's laws may be slightly different from another state's. But that nowhere appears as a basis in our preemption jurisprudence to preempt a state law if state A's law is different than state B. The inquiry is whether the state law conflicts with the federal law. And since it's not impossible to comply with both statutes, and since sports wagering does not conflict with any of the purposes that led Congress to pass Dodd-Frank and put swaps onto transparent markets, Maryland's Sports Wagering Act cannot be preempted and can coexist alongside the Commodity Exchange Act. Thank you. If there are no further questions. Thank you. Brower. Do we have one? Thank you, Your Honors. I'd like to start with one overarching point and then address the swaps question and then address the preemption question. The overarching point is I don't want the court to be left with the impression that the CFTC is not now regulating our products. It is. There is an extremely complicated statutory architecture around what products DCMs may offer, how they interact with the CFTC, all sorts of obligations about preventing market manipulation, preventing market disruptions, all sorts of obligations about record-keeping retentions, about the ability to reconstruct trading, and the like. This is an incredibly complex area of the law, and we are subject to an overwhelmingly, what the Supreme Court called, a comprehensive regulatory scheme that applies to us in the same way that it applies to the Chicago Mercantile Exchange. And so we are being regulated by the CFTC right now, just as the Chicago Mercantile Exchange is being regulated by the CFTC right now. And it is true, of course, the CFTC is engaged in a rulemaking process to provide additional guidance and clarity. Are there any regulations on what events you can... Any restrictions on what events you can put... make the subject of your contract? Events? Contracts? There's the provision of the statute that requires an event with potential financial commercial consequences, and then there's the special... Well, there's always money. There's always money involved when someone wages the money, because that's the whole idea about derivatives. But I'm questioning, you can... There's no limit, right, on what events you can set up with the... I know it's based on the wagers themselves set this rather than bookmaking, that kind of thing, but there's no limitation on, for example, you could say, well, I don't want to talk about news events, but some of them have been rather crude-type things you can, you know, sort of wager on. So there's no restrictions, right? So the restriction is the special rule, and the restriction is if it falls within one of these categories, then the CFTC can undertake a 90-day process under the special rule, and if at the conclusion of that process it concludes that the instrument is contrary to the public interest, then yes, it can prohibit the contract. So that is the tool that the CFTC now has. If it takes a look at any of these contracts, if it thinks that the underlying event in any of these contracts is inappropriate, is false within one of the categories, and is contrary to the public interest, then yes, the CFTC has that power right now, and that's the power that the CFTC tried to apply against Calshe two years ago. We had the opportunity to challenge it. We prevailed in court. But yes, so there is that back-end ability right now, and then the ongoing rulemaking process is designed to provide more detail, more clarity for, you know, market participants and for the public, but I don't want the court to be left with the misimpression that these contracts are not being regulated as we speak. So that's the first point. With respect to swaps, I'll go back to questions that I think Judge Benjamin and Judge Gregory, you asked my colleague. As I think some of Your Honor's questions noted, the definition of swap is broad. They have offered a couple of limiting principles to the broad definition. Those limiting principles just do not work with the statutory text. They say that an outcome is different from an event, but dictionary after dictionary expressly defines event to include outcomes. They say that an event has to be inherently associated with financial consequences, but inherently isn't in the statute. Instead, the word that Congress used was potential, which is effectively the opposite of inherent. And even if they were right about inherent or it's downstream or it's too downstream, I mean, look at weather events, which are a classic event contract. Are weather events inherently financial? Are they tied to inherent, you know, indices or whatever the limiting principle they argue for is? No, it's the same sort of issue. It's you look at an event, you decide whether it has potential economic consequences. If it does, then it's an appropriate instrument for hedging and it's an appropriate instrument for the price discovery. Well, he says that we need to look at, so the Super Bowl example, I need to look at the, that we should look at the outcome. Are there, there are no financial or potential financial, there's no potential financial consequences to winning the Super Bowl. There are for, I guess, if it was an event, but the outcome. The, so he did say that who wins the Super Bowl has no financial consequences and that is categorically incorrect. The Seattle Seahawks winning the Super Bowl last year has massive financial consequences for the franchise, for the city of Seattle, for a huge number of sponsors and advertisers and you know, all the like. I'm guessing if they have a parade, there's a financial consequence. There's a financial consequence if they have a parade in the city of Seattle after winning the Super Bowl, of course. And it's not just with respect to big events like the Super Bowl and I really want to caution the court. I mean, there's sort of a lot of intuitions that I think we come into this case with about what has financial consequences and what doesn't and our federal regulator who regulates not just event contracts and not just sports event contracts, but all derivatives has now come before multiple federal courts saying of course these contracts are proper derivatives. Of course they have the sorts of financial consequences that we think are properly the basis of a derivatives contract and I would just note that you know, that they have to make, I think they have to prove that no sporting events, no outcome of any sporting event has financial, has even potential financial consequences for their understanding of the term swap to be correct and I just don't think that's a plausible understanding particularly in light of the CFTC's, particularly in light of the CFTC's. But you agree in terms of defining the financial consequence, it has to be broader than just a consequence with the wagers. Yes, absolutely. You agree with that? It has to be extrinsic to the contract. That's right. And so that's why these sports event contracts, it's not that you know, even if there's people who are putting positions on event contracts, that's not the consequences we're talking about.  So that's with respect to swaps and the other thing with respect to swaps that I want to make sure to note is Judge Benjamin to your question about the special rule. The special rule is just powerful textual evidence. I mean the header of the special rule is transactions, agreements or swaps in excluded commodities and then it lists these categories including gaming and then it says not that they're banned but that the CFTC, the commission, may determine that these contracts are contrary to the public interest. So of course Congress understood that these could be swaps and Congress's solution to the issue was not to give 50 different states authority to prohibit them but rather to give the CFTC an additional tool to make a public interest call and the problem that I think the defendants have is they don't like the way that the CFTC is regulating us but that's not a basis to find that they don't have the authority under the CEA to do so. So that's with respect to swaps and I just do want to emphasize that the real textual difficulties with their argument. Now with respect to preemption they said you begin with a presumption. They said it's not a freewheeling exercise. We agree it's not a freewheeling exercise. We agree it begins with a text and the text could not be clearer. Exclusive jurisdiction of course preempts state laws. That's what exclusive means. It means not shared with others. So when Congress gives a federal agency exclusive jurisdiction that means that state laws are superseded and you can look at that provision then you can look at the savings clause that my friend pointed to which says that except as provided by the CFTC's exclusive jurisdiction nothing about this section shall supersede state laws. So the fact that it says nothing is superseding state laws except for the CFTC's exclusive jurisdiction is even further powerful evidence of preemption. And I mean this court in the Nazarian case that we cite in our brief that was affirmed by the Supreme Court in Hughes I mean case after case after case cites preemption or uses the phrase exclusive authority as a synonym for preemption and this comes up in other statutory contexts as well. The CEA is not. And what it is is it is a sign Judge Gregory that Congress wanted not just to preempt specific state laws but it wanted to preempt the field. It is express language preempting a field. That's what exclusive jurisdiction does. So that's with respect to preemption and I do want to make sure I address conflict preemption Judge Benjamin you noted that. I will just refer to the court the position that the CFTC has taken with respect to conflict preemption is that it is impossible for DCMs to provide the impartial access that their federal regulations require if they're subject to 50 different state licensing schemes if they're sort of cordoning off liquidity if they're only offering contracts within one state. I mean how can you run a nationwide exchange if we have to get a license they say from Maryland and getting a license from Maryland means that we can only accept positions from within the state of Maryland. We can't run a nationwide exchange that way and that is what I mean the case that they cited you to the American agriculture case from the Seventh Circuit says if a state law would directly affect trading on a designated contract market it is preempted and that is what we have here. I don't think that there's any dispute that this law is directly affecting trading on a designated contract market. It's purporting to ban it and we can't get a license because getting a license would take us out of compliance with the whole scheme that Congress set up. So I do think conflict preemption is in some ways a more straightforward way to get to the answer in this case and I'll note that the Third Circuit found both field and conflict preemption. I'm happy to answer other questions. Thank you. Thank you very much counsel. We'll come down, greet counsel and proceed to our next case.
judges: Roger L. Gregory, Stephanie D. Thacker, DeAndrea Gist Benjamin